# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

MOHAMMAD BALOCH,                                   :
                                                   :
                    Plaintiff,              :    Civil Action No.:    03-1207 (RMU)
                                                   :
                    v.                      :    Document Nos.:    52, 59
                                                   :
GALE NORTON,                                       :
In Her Official Capacity as                        :
Secretary, U.S. Department of the Interior,        :
                                                   :
                    Defendant.              :

## MEMORANDUM OPINION

### GRANTING THE DEFENDANT'S MOTION FOR SUMMARY JUDGMENT; DENYING THE PLAINTIFF'S MOTION TO STRIKE THE DEFENDANT'S REPLY

## I. INTRODUCTION

New law and new claims return this matter to the court.  The plaintiff, Mohammad S.

Baloch, brings suit against the defendant, Gale Norton, Secretary of the Department of the

Interior, for age discrimination, hostile work environment and retaliation.  Compl. ¶ 1.  The court

previously granted in part the defendant's first motion for summary judgment – dismissing the

plaintiff's claims but permitting him to amend his complaint to raise a claim of retaliation based

on hostile work environment.  Jan. 13, 2005 Mem. Op. at 20-21.  The plaintiff raised such a

claim in Counts 13-15[1] of his third amended complaint.  Third Am. Compl. ¶¶ 126-234.  The

plaintiff's complaint is now in its fourth iteration, alleging in Counts 16-18 that the instances of

alleged retaliation constitute acts of retaliation that are independently and collectively actionable

---

[1]      Counts 1-12 were dismissed by the court in its January 13, 2005 order; the plaintiff reiterates them only for the purposes of appeal.  Third Am. Compl., at 1 n.1.

in themselves, as well as being constitutive of a hostile work environment.  Fourth Am. Compl.

("Am. Compl.") ¶¶ 235-343.  The defendant now moves for summary judgment on the new

counts.[2]  Def.'s Apr. 2, 2007 Mot. for Summary J. ("Def.'s Mot. for Summ. J.") at 1-3.  Because

the court concludes that the plaintiff has not provided evidence on his claims sufficient for a

reasonable juror to make a finding of guilt, the court grants the defendant's motion for summary

judgment.

---

[2]    On June 29, 2007, the plaintiff filed a motion to strike the defendant's reply.  The motion contends that the reply impermissibly raises the issue of the lapse of time between the defendant's actions and the plaintiff's pursuit of discrimination protections.  Pl.'s Mot. to Strike at 3.  The motion also objects to the defendant's response to the plaintiff's statement of genuine issues, arguing that the Local Civil Rules do not authorize such an opportunity for rebuttal.  *Id.* at 6.  The defendant replies that, one, the plaintiff first raised the issue of temporal proximity when establishing his prima facie case in his opposition, and, two, the rules do not prohibit submissions to supplement the record in a reply brief.  Def.'s Reply to Mot. to Strike at 4-5.

As a preliminary matter, the court observes that a motion to strike pursuant to the Federal Rules of Civil Procedure 12(f) is limited to pleadings.  *See Sidney-Vinstein v. A.H. Robins Co.*, 697 F.2d 880, 885 (9th Cir. 1983).  However, as a motion to strike a reply for raising new arguments addresses concerns identical with those in a motion for leave to file a sur-reply, courts will apply the standard of the latter when construing such a motion.  *United States ex rel. Hockett v. Columbia/HCA Healthcare Corp.*, --- F.Supp. 2d ----, 2007 WL 2039544, at *4 (D.D.C. July 17, 2007).  The decision to grant or deny leave to file a sur-reply is committed to the sound discretion of the court.  *Am. Forest & Paper Ass'n Inc. v. EPA*, 1996 WL 509601, at *3 (D.D.C. Sept. 4, 1996).  If the movant raises arguments for the first time in his reply to the non-movant's opposition, the court will either ignore those arguments in resolving the motion or provide the non-movant an opportunity to respond to those arguments by granting leave to file a sur-reply.  *Ben-Kotel v. Howard Univ.*, 319 F.3d 532, 536 (D.C. Cir. 2003); *Lewis v. Rumsfeld*, 154 F. Supp. 2d 56, 61 (D.D.C. 2001) (denying leave to file a sur-reply where the plaintiff failed to demonstrate that the defendant's reply presented any new matters).  Because the issue of temporal proximity was first raised by the plaintiff in his opposition, Pl.'s Opp'n to Def.'s Apr. 2, 2007 Mot. for Summ. J. ("Pl.'s Opp'n") at 21-22, the court will not strike the defendant's reply or grant leave to file a sur-reply.  As to the plaintiff's response to the defendant's statement of genuine issues, while the Local Rules do not contemplate this submission, they also do not prohibit it.  *See* LCvR. 56.1.  The court, therefore, permits it.

## II.  BACKGROUND

### A.  Factual History[3]

### 1.  The Early Years (1991 - 2000)

The plaintiff is a "brown-skinned" Muslim from Pakistan and over seventy years old. Def.'s June 28, 2004 Statement of Undisputed Material Facts ("Def.'s Statement") ¶ 1; Pl.'s July 28, 2004 Statement of Genuine Issues ("Pl.'s Statement") ¶ 1.  He has several medical conditions that do not interfere with his job performance and are not disabling, including blindness in his left eye.  Def.'s Statement ¶ 2.  The Bureau of Indian Affairs ("BIA") hired the plaintiff in 1991 as a "GS-14 Water Rights Specialist/Engineer" in its Natural Resources Division ("NRD").  Id. ¶ 3.  Although the parties disagree on the precise scope of the plaintiff's responsibilities at the BIA, the plaintiff generally performed tasks such as preparing the Office of Trust Responsibilities' ("OTR") budgets for water resources programs and working on water rights issues.  Id. ¶ 12.[4]

In 1996, Terrance Virden, Director of the OTR, designated the plaintiff Acting Branch Chief.  Id. ¶ 9.  Until 2000, the plaintiff worked directly under Virden.  Id. ¶ 13.  When Jeffrey Loman became Chief of the NRD in Spring 2000, he displaced Virden as the plaintiff's first-line supervisor.  Id.

The plaintiff received performance awards from the BIA in 1999, 2000 and 2001.  Am.

---

[3]    For background and context, the court reiterates the factual history laid out in its January 13, 2005 Memorandum Opinion.  Only the events transpiring between 2003 and 2004 as enumerated in the Fourth Amended Complaint, however, apply to the instant motion for summary judgment. Jan. 13, 2005 Mem. Op. at 20; Pl.'s Opp'n at 2 n.3.  Except where indicated, the facts are undisputed.

[4]    The plaintiff characterizes his duties as falling into two areas: water rights adjudication and water resources management planning.  Pl.'s Statement ¶ I.C.  The plaintiff further maintains that he was the only Water Rights Specialist who performed both of these functions from 1992 until 2001.  Id. ¶¶ I.D-E.

Compl. ¶ 13.  Furthermore, in his performance reviews from 1991 to 1995, the plaintiff received "outstanding" or "highly satisfactory" evaluations.  *Id.* ¶ 14.  Beginning in 1995, when the BIA switched to a "pass/fail" evaluation system, the plaintiff received "pass" ratings.  *Id.*

### 2.  Problems at Work: the Plaintiff and Jeffrey Loman (2000 - 2004)

The plaintiff alleges that, beginning in December 2000, Loman "repeatedly subjected [the plaintiff] to verbal abuse without cause."  Am. Compl. ¶ 16.  For example, when the plaintiff was at a meeting in New Mexico, Loman called the plaintiff and "exploded" about why funding for a historical study was not distributed, "shouted" that he did not approve of the plaintiff's extended stay in New Mexico, "ordered" the plaintiff to get his "fucking ass" back to Washington and reminded the plaintiff who his "fucking" supervisor was.  Def.'s Statement ¶ 15; Baloch Dep. at 45-48.

In March 2001, Loman and the plaintiff had a disagreement about why a report on the Zuni Salt Lake was not finalized.  Def.'s Statement ¶ 17.  As the plaintiff puts it, "Mr. Loman yelled and was abusive toward Mr. Baloch without cause."  Pl.'s Statement ¶ 17.  On March 13, 2001, Loman sent the plaintiff "fact finding" questions about the report.  Def.'s Statement ¶ 18. The plaintiff characterizes this "fact finding" as "disciplinary" and states that Loman threatened further disciplinary action.  Pl.'s Statement ¶ 18.  Three days later, Loman expressed dissatisfaction with the plaintiff's budget calculation process.  Def.'s Statement ¶ 19.  Loman again "screamed and shouted" at the plaintiff on March 26, 2001 regarding the Zuni Salt Lake report.  Pl.'s Statement ¶¶ II.L, N-P.  In May 2001, Loman and the plaintiff had a disagreement about whether the plaintiff would travel for an assignment or conduct the work by phone.  Def.'s Statement ¶ 26.  And in December 2001, Loman issued a letter of reprimand to the plaintiff.

Pl.'s Statement ¶ II.D.

After the plaintiff filed an "informal" Equal Employment Opportunity Commission ("EEOC") complaint in June 2001 and "refused the agency's demand to withdraw his complaint," Loman threatened a criminal investigation of the plaintiff, review of his personnel file and scrutiny of all the plaintiff's travel vouchers. Am. Compl. ¶¶ 20-21. When he filed a formal EEOC complaint in August 2001, "Mr. Loman's harassment of and hostility towards [the] plaintiff increased sharply." *Id.* ¶ 23. Loman issued the plaintiff a "letter of counseling" on January 4, 2002, a second "letter of counseling" on March 3, 2003 and a "letter of reprimand" on April 8, 2003 concerning the plaintiff's "failure to perform assigned duties as directed, failure to follow a supervisor's directive and unprofessional and discourteous conduct." Def.'s Statement ¶¶ 29-32. Loman also subjected the plaintiff to "fact finding" disciplinary meetings "in which [the plaintiff] was interrogated, intimidated, and verbally abused," Am. Compl. ¶ 24, and did not give the plaintiff a cash award for his performance in 2001, despite the plaintiff's extensive work on the Zuni Salt Lake Report, *id.* ¶ 25.

On February 5, 2003, Loman gave the plaintiff a notice of leave restriction. Def.'s Statement ¶ 30. A week later, Loman questioned the plaintiff "in a hostile and accusatory tone" about a doctor's appointment the plaintiff had on February 10, 2003 and asked the plaintiff "extremely personal and invasive questions, including whether [the plaintiff] was being treated for diseases such as AIDS." Baloch Decl. ¶ 90. On March 13, 2003, Loman yelled at the plaintiff regarding a request for advanced sick leave the plaintiff had submitted on March 3, 2003. *Id.* ¶ 91. On this occasion, Loman told the plaintiff that he could not understand why the plaintiff had received performance awards and questioned the plaintiff's writing abilities. *Id.*

5

In August 2003, Loman re-issued restrictions on the plaintiff's use of sick leave. Def.'s Statement ¶ 33. That month, Loman escorted the plaintiff to a vacant office, slammed the door shut and shouted at the plaintiff that Loman was "fed up" with the plaintiff's "bullshit" complaints. Pl.'s Statement ¶ II.P. On September 25, 2003, Loman issued a memorandum of proposed suspension for two days. Def.'s Statement ¶ 36. In October 2003, Loman refused to sign the plaintiff's travel requests to prepare for a conference and threatened to have the plaintiff "arrested, led out of the main Interior building in handcuffs, and jailed." Pl.'s Statement ¶ II.Q. The same month, Loman gave the plaintiff a performance report that rated the plaintiff's performance results as "not achieved." Def.'s Statement ¶ 38. Finally, in January 2004, Loman issued a proposal to suspend the plaintiff for thirty days. Pl.'s Statement ¶ II.A.

### 3. Daniel Picard Arrives (2001)

In May 2001, Loman hired Daniel Picard as a "GS-14 Water Rights Specialist." Def.'s Statement ¶ 21. Picard is a forty-five year old Native American with experience in water law, Indian water rights, gaming and events and information services. *Id.* ¶¶ 21-23. The defendant characterizes Picard's responsibilities as water rights adjudications, distribution of funds pertaining to water rights adjudication and management of water resources. *Id.* ¶ 24-25. The plaintiff maintains that Picard "took over all or virtually all the water resources and water resources management duties." Pl.'s Statement ¶ 24. As a result, the plaintiff received no further assignments in water rights adjudication, and by December 2002, the plaintiff's "remaining substantive programmatic duties in water resources management planning were withdrawn and either transferred [] to Mr. Picard or performed by Jeffery Loman." *Id.* ¶¶ I.E-G. Thus, the plaintiff could only perform duties that, as the plaintiff puts it, were "not considered substantial

enough to be reflected in [the plaintiff's] position description." *Id.* ¶ I.H.

## B. Procedural History

On June 21, 2001, the plaintiff requested EEOC counseling based on race/national origin, age and disability discrimination.  Am. Compl. ¶ 20.  The plaintiff filed a formal EEOC complaint on August 30, 2001.  *Id.* ¶ 22; Def.'s Statement ¶ 28.  On December 11, 2001, the Director of Interior's Office for Equal Opportunity wrote to advise the plaintiff that his additional allegations were encompassed by his original formal complaint, and that no additional action was required.  Pl.'s July 28, 2004 Opp'n to Def.'s Mot. for Summ. J. ("Pl.'s First Opp'n") at 22.  Between August and November 2003, the plaintiff filed four administrative complaints regarding leave restrictions, hostile work environment, verbal harassment, refusal to authorize business travel, the threat to have the plaintiff arrested and an unsatisfactory performance appraisal.  *Id.* at 23-24 (filing complaints in 2003 on August 25, August 30, October 14, and November 13).  The plaintiff brought the instant action on June 4, 2003.  The defendant moved for summary judgment, which the court granted in part, dismissing the plaintiff's age discrimination and hostile work environment claims but permitting him to amend his complaint to raise a claim of retaliation based on hostile work environment from 2003-2004.[5]  The plaintiff has done so, the defendant has renewed its motion for summary judgment, and the court now considers the new counts.

---

[5]     The court denied the plaintiff's claim of a hostile work environment based on events stretching from December 2000 to January 2004, holding that the absence of actionable activity in 2002 defeated that claim.  Jan. 13, 2005 Mem. Op. at 20.

# III.  ANALYSIS

The plaintiff claims that the defendant retaliated against him for participating in the administrative complaints process and initiating this litigation.  Am. Compl. ¶ 127.  This retaliation allegedly took the form of twelve distinct acts beginning in February 2003; to wit: (1) the February 5, 2003 notice of leave restriction; (2) the August 6, 2003 notice of extension of leave restriction; (3) the March 3, 2003 letter of counseling; (4) the April 8, 2003 letter of reprimand; (5) the September 25, 2003 memorandum of two days' proposed suspension; (6) the January 8, 2004 memorandum of thirty days' proposed suspension; (7) Loman's communication with the grievance official deciding on the proposed suspension and Loman's drafting of the decision letter; (8) the February 12, 2003 verbal altercation between Loman and the plaintiff; (9) the March 13, 2003 verbal altercation between Loman and the plaintiff; (10) the August 5, 2003 verbal altercation between Loman and the plaintiff; (11) the October 10, 2003 verbal altercation between Loman and the plaintiff; and (12) the October 2003 evaluation of the plaintiff's performance as "not achieved."  *E.g.*, Am. Compl. ¶¶ 128, 134, 136, 138, 140, 142, 143, 147, 149, 151, 154, 156.[6]  The plaintiff submits that these acts, both separately and collectively, are actionable as retaliation (Counts 16-18), and also created a hostile work environment (Counts 13-15).  Am. Compl. at 1 n.1.

## A.  Legal Standard for a Motion for Summary Judgment

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

---

[6]     These acts form the bases of Counts 13-18 (the claims at issue), and are recapitulated in each.  *See generally* Am. Compl.

genuine issue as to any material fact and that the moving party is entitled to a judgment as a

matter of law." FED. R. CIV. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322

(1986); *Diamond v. Atwood*, 43 F.3d 1538, 1540 (D.C. Cir. 1995).  To determine which facts are

"material," a court must look to the substantive law on which each claim rests. *Anderson v.*

*Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A "genuine issue" is one whose resolution could

establish an element of a claim or defense and, therefore, affect the outcome of the action.

*Celotex*, 477 U.S. at 322; *Anderson*, 477 U.S. at 248.

      In ruling on a motion for summary judgment, the court must draw all justifiable

inferences in the nonmoving party's favor and accept the nonmoving party's evidence as true.

*Anderson*, 477 U.S. at 255.  A nonmoving party, however, must establish more than "the mere

existence of a scintilla of evidence" in support of its position.  *Id.* at 252.  To prevail on a motion

for summary judgment, the moving party must show that the nonmoving party "fail[ed] to make

a showing sufficient to establish the existence of an element essential to that party's case, and on

which that party will bear the burden of proof at trial."  *Celotex*, 477 U.S. at 322.  By pointing to

the absence of evidence proffered by the nonmoving party, a moving party may succeed on

summary judgment.  *Id.*

      The nonmoving party may defeat summary judgment through factual representations

made in a sworn affidavit if he "support[s] his allegations . . . with facts in the record," *Greene v.*

*Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999) (quoting *Harding v. Gray*, 9 F.3d 150, 154 (D.C. Cir.

1993)), or provides "direct testimonial evidence," *Arrington v. United States*, 473 F.3d 329, 338

(D.C. Cir. 2006).  Indeed, for the court to accept anything less "would defeat the central purpose

of the summary judgment device, which is to weed out those cases insufficiently meritorious to

warrant the expense of a jury trial." *Greene*, 164 F.3d at 675.

Finally, the D.C. Circuit has directed that because it is difficult for a plaintiff to establish proof of discrimination, the court should view summary-judgment motions in such cases with special caution. *See Aka v. Wash. Hosp. Ctr.*, 116 F.3d 876, 879-80 (D.C. Cir. 1997), overturned on other grounds, 156 F.3d 1284 (D.C. Cir. 1998) (en banc); *see also Johnson v. Digital Equip. Corp.*, 836 F. Supp. 14, 18 (D.D.C. 1993).

### B.  Loman's Acts Were Not Individually or Collectively Retaliatory

### 1.  Legal Standard for Retaliation Under the Rehabilitation Act, Title VII, and the ADEA

To prevail on a claim of retaliation, a plaintiff must follow the *McDonnell Douglas* framework. *Morgan v. Fed. Home Loan Mortgage Corp.*, 328 F.3d 647, 651 (D.C. Cir. 2003) (applying the *McDonnell Douglas* framework to a Title VII retaliation claim); *Duncan v. Wash. Metro. Area Transit Auth.*, 214 F.R.D. 43, 49-50 & n.8 (D.D.C. 2003) (applying the *McDonnell Douglas* framework to a Rehabilitation Act retaliation claim). The Supreme Court explained the framework as follows:

> First, the plaintiff has the burden of proving by the preponderance of the evidence a prima facie case of [retaliation]. Second, if the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant "to articulate some legitimate, [non-retaliatory] reason for the employee's rejection" . . . . Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for [retaliation] . . . . The ultimate burden of persuading the trier of fact that the defendant intentionally [retaliated] against the plaintiff remains at all times with the plaintiff.

*Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981) (internal citations omitted) (quoting *McDonnell Douglas v. Green*, 411 U.S. 792, 802 (1973)).

To establish a prima facie case of retaliation, a plaintiff must show that (1) he engaged in a statutorily protected activity, (2) a reasonable employee would have found the challenged action materially adverse, and (3) there existed a causal connection between the protected activity and the materially adverse action. *Burlington N. & Santa Fe Ry. Co. v. White*, 126 S. Ct. 2405, 2415-16 (2006); *see also Scott v. Kempthorne*, 2006 WL 1980219, at *3 (10th Cir. July 17, 2006). The plaintiff's burden is not great: the plaintiff "merely needs to establish facts adequate to permit an inference of retaliatory motive." *Forman v. Small*, 271 F.3d 285, 299 (D.C. Cir. 2001).

With regard to the first prong of the plaintiff's prima facie case of retaliation, statutorily protected activities include the filing of EEOC complaints and the initiation of litigation to vindicate claims of employment discrimination or retaliation. *Forkkio v. Powell*, 306 F.3d 1127, 1131-32 (D.C. Cir. 2002); *see Lemmons v. Georgetown Univ. Hosp.*, 431 F. Supp. 2d 76, 91 (D.D.C. 2006) (defining an activity as "protected," so long as "it involves opposing alleged discriminatory treatment by the employer or participating in legal efforts against the alleged treatment") (quotations omitted). As for the second prong, "[t]he anti-retaliation provision seeks to . . . prohibit[] employer actions that are likely 'to deter victims of discrimination from complaining to the EEOC,' the courts, and their employers. And normally petty slights, minor annoyances, and simple lack of good manners will not create such deterrence." *Burlington*, 126 S. Ct. at 2415 (citations omitted). The law "protects an individual not from all retaliation, but from retaliation that produces an injury or harm." *Id.* at 2414. Additionally, "the significance of any given act of retaliation will often depend upon the particular circumstances. Context matters." *Id.* at 2415. Finally, under the third prong, the plaintiff may establish a causal

11

connection "by showing that the employer had knowledge of the employee's protected activity, and that the [retaliatory] personnel action took place shortly after that activity." *Cones v. Shalala*, 199 F.3d 512, 521 (D.C. Cir. 2000) (quoting *Mitchell v. Baldrige*, 759 F.2d 80, 86 (D.C. Cir. 1985)).  To qualify as a causal connection, however, the temporal proximity between the employer's knowledge of the protected activity and the adverse personnel action must be "very close." *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (noting that a three- or four-month period between an adverse action and protected activity is insufficient to show a causal connection, and that a 20-month period suggests "no causality at all").

Furthermore, while the plaintiff is not required to plead each element of his prima facie case to survive a motion to dismiss, *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 515 (2002), the court may consider it to determine "whether the plaintiff can ever meet his initial burden to establish a prima facie case," *Rochon v. Ashcroft*, 319 F. Supp. 23, 29 (D.D.C. 2006).

### 2. Loman's Acts Were Not Individually Retaliatory

The defendant does not dispute that the plaintiff engaged in protected activity by pursuing administrative complaints.  *See generally* Def.'s Mot. for Summ. J.; *Rochon v. Gonzalez*, 483 F.3d 1211, 1215-16 (D.C. Cir. 2006) (defining filing of EEOC complaints and litigation in support thereof as protected activity).  But the defendant does contest whether the twelve acts taken by Loman were materially adverse to the plaintiff.[7]

### a. The Sick Leave Notices

On February 5, 2003, Loman imposed sick leave procedures on the plaintiff that were

---

[7]   Because the court determines that none of the alleged measures were adverse actions, it need not reach the question of whether they were taken in response to the plaintiff's administrative complaints and litigation.  *See* Pl.'s Opp'n at 23-26 (discussing causation).

extended for an additional six months on August 6, 2003.  Def.'s Statement ¶¶ 30, 33.  The

defendant asserts that these restrictions merely required that the plaintiff, when submitting his

sick leave request, provide a physician's certification specifying the nature of the illness and the

period during which the plaintiff was treated or examined.  Def.'s Mot. for Summ. J. at 11.

These restrictions were, the plaintiff argues, justified because Loman observed a  pattern of the

plaintiff taking excessive unscheduled sick leave (a total of eighteen days) preceding or following

weekends and holidays, as well as taking a full day of leave for doctor's appointments.  *Id.* at 3-4;

Def.'s Reply to Pl.'s Opp'n to Mot. for Summ. J. ("Def.'s Reply") at 18 (citing 276 hours of

mostly unscheduled sick leave in 2002).  Because the defendant ultimately approved all of the

plaintiff's requested sick leave, the defendant concludes that the restrictions did not injure him

and, therefore, do not constitute materially adverse actions.  Def.'s Mot. for Summ. J. at 11.

The plaintiff characterizes the defendant's allegations as "ridiculous."  Pl.'s Opp'n at 35.

He avers that the leave restrictions were "nothing but an attempt to interfere with [his] obtaining

needed medical treatment."  *Id.* at 35 (internal citations omitted).  As support, he notes that

Loman's secretary who received the plaintiff's and other employees' leave slips did not consider

his leave excessive, *id.* at 14; Pl.'s First Opp'n, Ex. 25 ("Village-Center Dep.") at 22-25, and that

he had a positive leave balance even after donating sick leave to an agency employee, *id.*, Ex. 3

("Baloch Decl.") ¶ 99.  Loman has acknowledged that he does not doubt that the plaintiff suffers

from a number of medical conditions.  *Id.*, Ex. 21 ("Loman Dep. II") at 82.  Kathleen Kogut, the

personnel specialist advising Loman, recommended that he first discuss his suspicions of leave

abuse with the plaintiff personally before imposing the restrictions.  *Id.*, Ex. 19 ("Kogut Dep.") at

23-25; Baloch Decl., Att. SS.  In further support, the plaintiff states that although Picard, the

younger water rights specialist working with Baloch, used "virtually the same amount of leave as Mr. Baloch," Loman did not subject Picard to leave restrictions.  Pl.'s Opp'n at 15.

The defendant replies that Loman took no action regarding Picard because he did not abuse his sick leave like the plaintiff did: while the plaintiff took eighteen sick days adjacent to weekends or holidays, Picard took only two.  Def.'s Reply at 18-19; Baloch Decl., Att. DD.  The defendant focuses its argument on the plaintiff's lack of evidence indicating that the notices deterred or impeded him from taking necessary sick leave.  Def.'s Reply at 10.

The focus of the defendant's argument needs no correction.  The plaintiff has failed to proffer evidence that would permit a reasonable juror to find that the imposition and extension of sick leave procedures were "materially adverse" measures that "could well dissuade a reasonable worker from making or supporting a charge of discrimination."  *Burlington*, 126 S.Ct. at 2409. In the first place, because there were colorable grounds for the notice and its extension, a reasonable employee would have understood that the restrictions were not the offspring of a retaliatory mind-set.  *DeHart v. Baker Hughes Oilfield Ops., Inc.*, 214 Fed. Appx. 437, 442 (5th Cir. 2007).  The February 5, 2003 notice referenced a prior discussion between Loman and the plaintiff regarding the latter's use of sick leave on days abutting holidays and weekends.  Def.'s June 28, 2004 Mot. for Summ. J. ("Def.'s First Mot. for Summ. J."), Ex. 4.  It explained the deleterious impact these absences had on the office.  *Id.*  The August 6, 2003 extension likewise cited the negative impact the plaintiff's sick leave absences had on the office and explained that the extension was due to the plaintiff's failure to comply with the submission procedures articulated in the original notice.  Pl.'s First Opp'n, Ex. JJ-a.  Both notices urged that "it is important for you to understand that the reason for these restrictions is not punitive."  *Id.*; Def.'s

14

First Mot. for Summ. J., Ex. 4.  And because after the first sick leave notice Loman conveyed to

the plaintiff twice (once on February 12, 2003 and again on March 14, 2003) his perception that

the plaintiff was continuing to abuse sick leave, a reasonable employee in the plaintiff's

shoes would have attributed the leave restrictions to an ongoing non-discrimination-related dispute

with a supervisor rather than as covert retaliation for an complaint filed two years earlier.

*DeHart*, 214 Fed. Appx. at 442.

Furthermore, the fact that the restrictions imposed a negligible burden on the plaintiff's

employment conditions mitigate any deterrent effect a reasonable employee would ascribe to

them.  *Burlington*, 126 S.Ct. at 2409 (requiring the plaintiff to show that the employer's action

"could well dissuade a reasonable worker from making or supporting a charge of

discrimination").  An adverse personnel action is one that results in "objectively tangible harm."

*Brown v. Brody*, 199 F.3d 446, 457 (D.C. Cir. 1999).  The plaintiff never denies that all his sick

leave was approved.  Def.'s Reply at 10.  The restrictions were effective only for six months, at

which time they would expire or, absent compliance, be extended another six months.  Def.'s

First Mot. for Summ. J., Ex. 4.  The plaintiff has adduced no evidence that he was ever

"pressured to come to work when not feeling well," or "coerced to limit certain medical and

dental appointments."  *Turner v. District of Columbia*, 383 F. Supp. 2d 157, 178-79 (D.D.C.

2005) (denying motion for summary judgment when the plaintiff was denied use of sick days to

which she was entitled).  The plaintiff no doubt resented as tiresome, officious and perhaps

demeaning the imposition that he submit a doctor's certificate authenticating the nature and time

of his indisposal for every day of sick leave.  But "not everything that makes an employee

unhappy is an actionable adverse action."  *Rochon v. Gonzales*, 438 F.3d 1211, 1219 (D.C. Cir.

2006) (citation omitted).

Moreover, the timing of events belies the plaintiff's claim.  He filed his formal EEOC complaint in August 2001.  Loman imposed the leave restriction in February 2003, then extended it in August 2003.  As the plaintiff filed four additional administrative complaints between August and November 2003, he can hardly maintain that the leave restrictions deterred him from exercising his rights.  *See DeHart*, 214 Fed. Appx. at 442 (observing that the plaintiff's filing of complaints following the defendant's alleged retaliation discouraged a finding of deterrence); *Cheshire v. Paulson*, 2007 WL 1703180 at *6 (E.D.N.Y. 2007).  As the plaintiff has failed to establish that the sick leave notices were materially adverse actions, he has failed to establish a prima facie case of retaliation, and the counts of his complaint predicated upon them must fail.

### b.  Loman's Proposals of Suspension and *Ex Parte* Contact with Agency Officials

Loman issued two proposals to suspend the plaintiff for failure to follow leave procedures.  The first, articulated in a September 25, 2003 memo, proposed a two-day suspension, noting that the plaintiff presented a medical certification for sick leave that failed to indicate the type and duration of incapacitation.  Def.'s Mot. for Summ. J. at 11, 14.  The second, announced in a January 4, 2004 memo, canceled the prior memo, and proposed instead a thirty-day suspension.  *Id.* at 14.  It charged the plaintiff with failing to submit a doctor's certificate for his leave taken October 24, 2003.  *Id.*  The proposal also accused the plaintiff of submitting a doctor's certification dated November 14, 2003 for the October 24, 2003 appointment that did not specify the nature or duration of his treatment.  *Id.* at 15.  The plaintiff claims he lost the original certification and, in lieu thereof, submitted a later substitution from his doctor.  *Id.*

The second proposal also alleges that the plaintiff left his voicemail box full, which

impeded timely contact with a BIA field representative. Pl.'s Opp'n at 12. The plaintiff objects that Loman gave the field representative in question a wrong telephone number for the plaintiff. *Id.* at 34. The defendant replies that this does not excuse the plaintiff from proactively contacting work colleagues in a timely manner after he has acknowledged receiving messages from them. Def.'s Reply at 21.

After the plaintiff responded to Loman's proposal to suspend him, Loman communicated with the designated official handling the plaintiff's grievance and drafted a proposed decision. Am. Compl. ¶ 156. The plaintiff characterizes this action as inappropriate and retaliatory. Am. Compl. ¶ 157; Pl.'s Opp'n at 13. The defendant explains that the deciding official asked Loman to draft the decision, Def.'s Mot. for Summ. J. at 18, and argues that the contact had no adverse effect on the plaintiff because the decision was ultimately reassigned to another official who did not have contact with Loman, *id.* at 11-12. Moreover, the defendant has not, after more than three years, approved the proposed suspension. *Id.* The plaintiff counters that, even though the proposal has never been approved, it has never been withdrawn, either. Pl.'s Opp'n at 13.

None of these allegations are sufficient to defeat summary judgment. Again, both memos present colorable grounds for the proposed suspension. The September 25, 2003 memo states that the plaintiff took a day of sick leave on September 4, 2003, but did not, contrary to prior discussions, submit a request for leave and a certification of the nature and the duration of his illness from his doctor. Pl.'s First Opp'n, Ex. LL. The memo then conducts a twelve-factor, three-page analysis of the proposed penalty, setting forth the history of the plaintiff's conduct and Loman's assessment of the seriousness and redressability of the situation. *Id.* The memo recalls that the plaintiff characterized the August 7, 2003 extension of leave restriction as "just another

17

act of intimidation and harassment" before exclaiming "why don't you take an action that means something instead of continuing to bother me with this insignificant stuff?" *Id.* Loman concludes that "[t]his statement leaves me no other option then [sic] to believe that you have no respect for my authority as your supervisor and no inclination to follow any directive except those which you alone choose to comply with." *Id.*

The January 8, 2004 memo reiterates the charges of the prior memo, supplementing them with an allegation that the plaintiff failed to return a client's call on September 25, 2003 (contrary to an April 8, 2003 reprimand about the plaintiff's unchecked voice mailbox). Pl.'s First Opp'n, Ex. PP. This memo, too, conducts an extensive analysis forestalling charges of unwarranted retaliation, with Loman recalling to the plaintiff that in prior conversations: "[you] asserted that because you were a professional employee, you should not be bothered with having to fill out what you described as 'senseless forms' . . . [but] you could have avoided these situations by simply complying with the rules." *Id.* A jury could reasonably conclude that Loman exerted his supervisory authority in a petty, counterproductive manner, but anti-discrimination laws do not protect against workplace incivility. *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998). These memos support a finding that Loman sanctioned the plaintiff for failure to follow leave procedures and insubordination, but not for engaging in protected activity.

These memos also fail to constitute adverse action because they exert only a negligible impact on the plaintiff. The mere initiation of an investigation, without tangible consequences, into a plaintiff's conduct is not an adverse action. *Cf. Velikonja v. Gonzales*, 466 F.3d 122, 124 (D.C. Cir. 2006) (reversing dismissal where plaintiff claiming retaliation alleged "that she was subject to a lengthy investigation, that she was prevented from receiving promotions, and that the

defendants 'placed a cloud over [her] career'"). The plaintiff concedes that the BIA has never acted upon the suspension proposals. Baloch Decl. ¶ 94. Indeed, he admits that these actions "did not cause me to lose my pay, my grade, or my position." *Id.*; *compare Burlington*, 126 S.Ct. at 2417 (recognizing an adverse action because the plaintiff endured a 37-day suspension without pay or assurance that she would keep her job) *with Secherest v. Lear Siegler Servs., Inc.*, 2007 WL 1186597, at *4 (M.D. Tenn. Apr. 16, 2007) (concluding that no adverse action occurred where the plaintiff received two disciplinary writeups, the specific factual bases of which she did not dispute, that had no effect on her conditions of employment and that led to no further consequences). And the plaintiff has produced no arguments or evidence that he has sought and been denied promotions or any other career advancement because of the defendant's actions. *See Ginger v. Dist. of Columbia*, 477 F. Supp. 2d 41, 53 (D.D.C. 2007) (granting summary judgment for the defendant as the plaintiffs conceded that investigations of them did not result in discipline or suspension).

Likewise, the fact that Loman communicated with the designated official handling the plaintiff's grievance and drafted a proposed decision does not, in and of itself, amount to an adverse action. The plaintiff admits that as soon as the impropriety of Loman's actions was discovered, the BIA removed him from the decision-making process and substituted an uninvolved official. Am. Compl. ¶ 157. The plaintiff has not alleged that the defendant has acted upon the memos even though three years have passed since their drafting. *See Cheshire*, 2007 WL 1703180, at *6 (concluding that proposed suspension did not constitute adverse action, especially as plaintiff filed an EEOC complaint after receiving notice of action).

Finally, the timing of the above events dissuades the court from concluding that they

would have deterred a reasonable employee from protecting his rights.  The plaintiff filed four

administrative complaints between August and November of 2003.  Loman issued the first memo

on September 25, 2003.  The second was announced in January 4, 2004.  The spirited history of

exchanges between Loman and the plaintiff indicate that fear of repercussions never dampened

either parties' sallies, whether in the form of Loman's managerial sanctions for insubordination,

or the plaintiff's challenges to Loman's authority and successive EEOC filings and litigation.

Under these circumstances, a reasonable juror could not conclude that the suspension proposal

and contacts with agency officials amounted to retaliation.

### c.  The Letter of Counseling, the Reprimand and the Performance Evaluation

Loman issued the plaintiff a "letter of counseling" on March 3, 2003, which accused the

plaintiff of disregarding Loman's orders regarding the preparation of initial drafts on a project

action plan, making unauthorized travel arrangements, submitting a trip report late and

improperly instructing an attorney to submit documents to Loman rather than the plaintiff.[8]  Am.

Compl ¶ 136; Def.'s Mot. for Summ. J. at 15.  The plaintiff responded in a March 15, 2003 letter

disputing the charges, which he described as retaliatory.  The plaintiff claimed that, as to the

project action plan draft, Loman provided him with "barely an outline with a few topic headings,

which Loman did not direct him to follow in any event," Pl.'s Opp'n at 16; that an intervening

urgent work assignment prevented him from submitting a timely trip report; and that the

plaintiff's other supervisors commended him on his work, Baloch Decl. ¶¶ 103-06.  The

defendant replies that the plaintiff has not disputed that he failed to follow Loman's format or

---

[8]      Loman issued a prior letter of counseling on January 4, 2002 that is not the subject of the instant counts under consideration in the plaintiff's fourth amended complaint.

that his trip report was late or that he directed an attorney to submit documents to Loman rather than him.  Def.'s Reply at 21.

On April 8, 2003, Loman issued a "letter of reprimand" based on a grant recipient's complaint that the plaintiff failed to secure the recipient funding.  Am. Compl ¶ 140.  The plaintiff objects that delays in processing funding are routine in the BIA and that Loman perversely solicited a complaint out of animus.  *Id.* ¶ 141.  The defendant responds that the plaintiff failed to return calls and messages from clients for six months and was dilatory in executing a subsequent order from Loman to that effect.  Def.'s Mot. for Summ. J. at 16-17.  Moreover, Loman did not solicit a complaint, the defendant clarifies; he asked for documentation of the complaint from the client.  *Id.* at 17.

The reprimand also castigated the plaintiff for, first, failing to use his government credit card to purchase printer toner cartridges at the request of Loman and, second, canceling the credit card without authorization.  Def.'s First Mot. for Summ. J., Ex. 11, at 3.  The reprimand further directed the plaintiff not to air his grievances about Loman with work colleagues, after he sent courtesy copies of an e-mail to Larry Scrivner and Daniel Picard stating: "You [Loman] have just proven exactly what I have been saying I do not have any involvement in the budget process . . . . I am no longer involved . . . [and] your actions speak louder than words."  *Id.*  The plaintiff does not address these elements of the reprimand in his amended complaint or opposition.  *See* Am. Compl. and Pl.'s Opp'n.

On October 30, 2003, Loman issued an unsatisfactory performance appraisal of Baloch, finding him failing in the critical performance of his duties.  Pl.'s First Opp'n, Ex. NN.  In the appraisal, Loman complains that the plaintiff fails to respect Loman's authority, referencing,

*inter alia*, his abuse of travel privileges, failure to return messages and calls, and persistent disregard of sick leave restrictions. *Id.* The plaintiff states that all of his prior appraisals rated his performance as outstanding or, on a pass/fail system, passing. Pl.'s Opp'n at 13. He argues that Loman's evaluation constituted "the first step in removing Mr. Baloch from federal service." Am. Compl. ¶ 151. Moreover, he declares that Loman acted improperly in ignoring his commendations received during this rating cycle, Pl.'s Opp'n at 13-14, and in issuing the unsatisfactory evaluation without first obtaining the approval of his supervisor, Am. Compl. ¶¶ 151-53. The defendant counters that the performance evaluation had no effect on the plaintiff's pay or grade since he was already at the top of his pay scale, i.e., GS 14, step 10. Def.'s Mot. for Summ. J. at 12. Additionally, no evidence suggests that Loman was aware of the letters of commendation, since they were not addressed to him. Def.'s First Mot. for Summ. J., Ex. OO. Finally, the defendant argues that the deposition that the plaintiff cites regarding supervisor approval only indicates that a supervisor's signature is required eventually, not that the signature must precede the forwarding of the evaluation to the employee. Def.'s Reply at 23; Pl.'s First Opp'n, Ex. 24 ("Steele Dep.") at 14-16.

None of these measures rises to an adverse action that might reasonably deter an employee from protecting his rights. As in the preceding issues regarding leave and proposed suspension, the plaintiff was aware of the official charges against him. The plaintiff faced no ultimate consequences from these actions. *See Crawford v. Carroll*, 2007 WL 757666, at *8 (N.D. Ga. Mar. 8, 2007) (holding that a negative performance evaluation that deferred the plaintiff's raise for ten months and was ultimately retroactively granted but did not jeopardize her job or affect her base salary did not constitute adverse action); *Brown v. Brody*, 199 F.3d 446,

458 (D.C. Cir. 1999) (holding that letters of admonishment are not an adverse employment

action).  The plaintiff continued making EEOC complaints between August and November 2003,

clearly undeterred by Loman's measures taken in March, April and October that same year.  If

these disciplinary measures were intended by Loman as deterrents, they failed spectacularly.

### d.  The Yelling

The plaintiff cites four instances in which Loman yelled at him or spoke to him in a

hostile manner.  On February 12, 2003, Loman questioned the plaintiff "in a hostile and

accusatory tone" about a recent doctor's appointment, asking if he were being treated for AIDS at

one point. Am. Compl. ¶ 134.  On March 14, 2003, Loman entered the plaintiff's office and

"began yelling at him about a request for advanced sick leave." *Id.* ¶ 137.  During this encounter,

Loman denigrated the plaintiff's performance and "so threatened Mr. Baloch that he feared for

his safety." *Id.* ¶ 138.  On August 6, 2003, Loman ordered the plaintiff to go with him to a

vacant office and, with the door shut, began shouting that he was fed up with the plaintiff's

"bullshit complaints." *Id.* ¶ 142.  Again, the plaintiff indicates that he was physically afraid of

Loman. *Id.*  Finally, on October 10, 2003, Loman called the plaintiff into his office and, with the

door shut, began shouting at him, threatening to have him arrested and led out of the building in

handcuffs. *Id.* ¶ 149.

The defendant does not dispute the plaintiff's facts but argues that "[m]erely being yelled

at by your supervisor does not rise to the level of an adverse employment action."  Def.'s Mot.

for Summ. J. at 19 (quoting *Russ v. Van Scoyoc Assocs.*, 122 F. Supp. 2d 29, 32 (D.D.C. 2000));

*Bunyon v. Henderson*, 206 F. Supp. 2d 28, 30 (D.D.C. 2002).  The defendant points out that

Loman also yelled at the plaintiff in December 2000 and March 2001 – "long before [the

plaintiff] engaged in any protected activity."  Def.'s Mot. for Summ. J. at 20.  The defendant

submits that "talk is cheap," and because the plaintiff has proffered no evidence to show that

Loman ever attempted to have the plaintiff arrested or made any actual physical threats against

him, Loman's blustering is nonactionable.  Def.'s Reply at 14-15 (quoting *Dunn v. Wash. Cty.*

*Hosp.*, 429 F.3d 689, 692-93 (7th Cir. 2005)).

Here, too, the court concurs with the defendant.  As evident from the record, Loman

began yelling at the plaintiff almost as soon as he assumed his supervisory position.  Compl. ¶ 16

(alleging that, beginning in December 2000, Loman "repeatedly subjected [the plaintiff] to verbal

abuse without cause").  And Loman's strategy of leadership by loudness continued through the

following years, always preceded by some alleged infraction by the plaintiff.  Loman Dep. II at

10-16 (shouting profanity at the plaintiff while he was on travel on December 11, 2000); Baloch

Decl. ¶ 83 (directing "foul and abusive language" against the plaintiff for the unauthorized

release of a report on March 1, 2001); *id.* ¶ 86 (screaming at the plaintiff about an unsatisfactory

report on March 26, 2001); *id.* ¶ 90 (hostilely interrogating the plaintiff about sick leave on

February 12, 2003); *id.* ¶ 89 (demanding the plaintiff withdraw his informal complaint and

threatening criminal investigation and rigorous scrutiny of travel vouchers on July 18, 2001); *id.*

¶ 91 (yelling at the plaintiff about sick leave on March 13, 2003); *id.* ¶ 92 (describing the

plaintiff's complaints as "bullshit" and telling him to do what he was told on August 5, 2003); *id.*

¶ 93 (threatening to have the plaintiff arrested for abuse of government funds on October 10,

2003).

These events relate a protracted saga of implacable conflicts of personality over banal

employment matters – not retaliation for exercise of protected rights.  *See Higgins v. Gonzales*,

481 F.3d 578, 591 (8th Cir. 2007) (holding that a plaintiff cannot maintain a retaliation claim

based on "bad manners, or petty slights and snubs" or even a "serious personality conflict with

[a] supervisor").  The filing of a complaint after an alleged instance of retaliation militates

against a conclusion that retaliation occurred, as it demonstrates that the filer was not in fact

dissuaded from protecting his rights.  *DeHart*, 214 Fed. Appx. at 442.  Here, the plaintiff kept

filing administrative complaints throughout and even after Loman's tirades.  He filed his formal

EEOC complaint in August 31, 2001, a few weeks after Loman allegedly threatened him with a

criminal investigation and rigorous oversight of his travel.  Am. Compl. ¶ 22.  In 2003, the

plaintiff filed administrative complaints on August 25, August 30, October 14 and November 13.

Pl.'s First Opp'n at 23-24.  None of the incidences above deterred the plaintiff from protecting

his rights.

    A reasonable person in the plaintiff's position would have been aware that what

consistently precipitated Loman's eruptions was his failure to abide by Loman's specific orders

and, more generally, his lack of deference to Loman's administrative authority.  *See Gilmore v.

Potter*, 2006 WL 3235088, at *9 (E.D. Ark. Nov. 07, 2006) (discerning no adverse action even

though the defendant isolated the plaintiff in a small room, threatened her with being fired if she

came out onto the workroom floor, told her that she was "worthless," and told her not to talk to

coworkers); *Berger v. Iron Workers Reinforced Rodmen Local 201*, 843 F.2d 1395, 1424 (D.C.

Cir. 1988) (concluding that threats against plaintiffs, though probative of animus, "had no effect"

and, thus were "essentially harmless") (internal quotations omitted).

    The plaintiff avers that these verbal altercations with Loman have "so disturbed my

working environment that I am presently on medication to relieve anxiety and depression."

25

Baloch. Decl. ¶ 78.  He argues that Loman's outbursts are "particularly threatening" to him because the he knows that Loman is "a combat trained member of the Navy," who "maintains a personal arsenal of guns, including at least one automatic weapon[,] and has a history of being alcohol abusive." *Id.* ¶ 79.  Even assuming the sincerity of the plaintiff's representations, these allegations still fall short of establishing adverse retaliatory action, as the courts apply an objective reasonable person standard. *Burlington*, 126 S.Ct. at 2415.  The subjective mental state of the plaintiff based on his individualized psychic vulnerabilities or anxieties is not cognizable. *Id.* The court may agree with the plaintiff that a supervisor who yells at his employee marks himself as a bully, lacking the most basic professionalism.  But until Congress invites the courts to sit as boards of review on personnel decisions, such action will not warrant inspection by a jury. *Burlington*, 126 S.Ct. at 2415.

### 3.  Loman's Acts Were Not Collectively Retaliatory

The plaintiff argues that the defendant failed to consider whether the individually alleged acts were also collectively retaliatory.  Pl.'s Opp'n at 31-32.  However, there are two parties before the court guilty of this sin of omission.  The plaintiff has stated that "when taken together," the incidents alleged "collectively" constitute retaliation. *Id.* at 31.  But the evidence he cites in support merely catalogues each instance and its effect separately. *Id.* Moreover, the fourth amended complaint does not clearly indicate that the instances of retaliation should be considered collectively as well as individually. *See, e.g.*, Am. Compl. ¶ 236 (claiming that the "defendant retaliated against plaintiff beginning in 2003 by taking the following actions").  And, finally, the defendant's refutation of the charges individually does, even if only implicitly, refute the umbrella charge that the acts collectively constitute retaliation. *See Walker v. Johnson*, 2007

WL 2350112, at *17 (D.D.C. Aug. 17 2007) (refuting charge of "pervasive retaliatory policy" by analyzing each instance separately).  The court, therefore, dismisses the suggestion that the defendant has waived its objection to the charge of collective retaliation.

The only document in which the plaintiff explains at any length how the acts collectively constitute retaliation is the plaintiff's declaration attached to his May 4, 2007 opposition to summary judgment.  Pl.'s Opp'n, Ex. 2 ("Second Baloch Decl.") ¶ 3-4.  Therein, he argues that his encounters with Loman have placed his career "in jeopardy": "Even if I am not discharged, my professional reputation within BIA and the Department of Interior as well as with the large community of Native Americans and other beneficiaries . . . has been greatly tarnished." *Id.* ¶ 3. What's more, he asserts that his "emotional well-being has also been disrupted by the constant fear that Loman may succeed in destroying my career or that he may harm me physically." *Id.* ¶ 4.

The plaintiff faces a number of difficulties here.  The first is that the plaintiff offers no guidance as to what distinguishes his hostile-work-environment-based retaliation claim from his incidents-collectively-viewed retaliation claim.  He does not explain how viewing the incidents collectively establishes any element of retaliation to greater effect than viewing them separately. *Cf. Wideman v. Wal-Mart Stores, Inc.*, 141 F.3d 1453, 1456 (11th Cir. 1998) (concluding that measures falling short of ultimate employment actions, when viewed collectively, established a pattern of adverse actions).  In fact, no bright line rule exists for determining when a number of retaliatory actions – none of which independently constitutes a typical material adverse action – together comprise a pattern of retaliation: courts must exercise their judgment carefully on a case-by-case basis. *See Wanamaker v. Columbian Rope Co.*, 108 F.3d 462, 464 (2d Cir.1997).

The second difficulty is that, as explained above, *supra* Part III.B.2.e, a claim of retaliation predicated only on the subjective mental impressions of an employee will not reach a jury. *Burlington*, 126 S.Ct. at 2415.

For itself, the court cannot discern a collective retaliation claim greater than the sum of its parts.  In the approximately one-year period examined, the plaintiff filed four additional complaints, the first of which followed the majority of the alleged twelve incidents.  The incidents do not, as a whole, demonstrate a departure from the parties' conflict-ridden interactions beginning before the plaintiff engaged in protected activity.  *See supra* Part II.A.2.  Nor does the plaintiff explain how these incidents amount to the sort of "repeated threats against individuals in response to their exercise of protected rights [that] may amount to harassment sufficient to establish a claim of retaliation."  *Berger*, 843 F.2d at 1424.  If anything, the incidents reveal a dynamic of one-upsmanship, with Loman instituting sick leave or other supervisory restrictions on the plaintiff, the plaintiff disregarding them, and Loman upping the ante.  Such disciplinary "chicken," resolving minor personnel disputes based on who blinks first, may be bad management practice, but it is distinguishable from the type of constant, pervasive oversight of an employee's performance identified by a proactive search for minor infractions as pretext for retaliatory harassment.  *Cf. Wideman*, 141 F.3d at 1456 (discerning a pattern of retaliatory harassment when a supervisor mis-scheduled the plaintiff's work hours, denied her a lunch break, surveyed co-workers for complaints about her, reprimanded her, suspended her for one day and threatened to shoot her in the head).  In sum, the plaintiff has failed to construct a prima facie case to support its claim that the alleged acts were collectively retaliatory.

**C.  The Court Denies the Claim of Retaliation In the Form of a Hostile Work Environment**

**1.  Legal Standard for Discrimination Claims Based on Hostile Work Environment**

In this circuit, a hostile work environment can amount to retaliation under Title VII.

*Hussain v. Nicholson*, 435 F.3d 359, 366 (D.C. Cir. 2006).  To prevail on such a claim, however,

the plaintiff must show that the defendant subjected him to "discriminatory intimidation, ridicule,

and insult" of such "sever[ity] or pervasive[ness] [as] to alter the conditions of [his] employment

and create an abusive working environment."  *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21-22

(1993) (*quoting Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 64 (1986)).  To determine

whether a hostile work environment exists, the court looks to the totality of the circumstances,

including the frequency of the discriminatory conduct, its severity, its offensiveness, and whether

it interferes with an employee's work performance.  *Faragher v. City of Boca Raton*, 524 U.S.

775, 787-88 (1998).  Ultimately, "[s]o long as the environment would reasonably be perceived,

and is perceived, as hostile or abusive," it is actionable.  *Harris*, 510 U.S. at 22.  In considering

the totality of the circumstances, the court is mindful that:

> [e]veryone can be characterized by sex, race, ethnicity or (real or perceived)
> disability; and many bosses are harsh, unjust and rude.  It is therefore important in
> hostile work environment cases to exclude from consideration personnel decisions
> that lack a linkage of correlation to the claimed ground of discrimination.  Otherwise,
> the federal courts will become a court of personnel appeals.

*Bryant v. Brownlee*, 265 F. Supp. 2d. 52, 63 (D.D.C. 2003) (quoting *Alfano v. Costello*, 294 F.3d

365, 377 (2d Cir. 2002)).

**2.  The Plaintiff Fails to Establish an Objectively Hostile or Abusive Work Environment**

The plaintiff rests on the collective weight of his alleged incidents to establish his hostile

work environment claim, contending that, in light of the fact that the acts "were perpetrated by a

former Navy Seal against a man in his 70's with health problems," they constituted "a direct threat not only to Mr. Baloch's emotional stability, but to his otherwise unblemished 43-year career as an engineer."  Pl.'s Opp'n at 27.

The defendant observes that the sick leave notices, letter of counseling, reprimand, notices of proposed suspensions and performance evaluation do not contain any words of intimidation, ridicule or insult.  Def.'s Mot. for Summ. J. at 22.  Also, the plaintiff does not allege that he was aware of Loman's *ex parte* contacts with the decision maker regarding the proposed suspension action at the time they took place or explain how they rendered the workplace hostile.  *Id.* at 23.  The four times that Loman allegedly yelled at the plaintiff, the defendant further maintains, also cannot establish a hostile work environment, as they lack sufficient severity and consequence.  *Id.* at 23-24.

The hostile work retaliation claim fails.  As a general matter, this jurisdiction frowns on plaintiffs who attempt to bootstrap their alleged discrete acts of retaliation into a broader hostile work environment claim.  *See Keeley v. Small*, 391 F. Supp. 2d 30, 51 (D.D.C. 2005); *Lester v. Natsios*, 290 F. Supp. 2d 11, 33 (D.D.C. 2003) (explaining that "[d]iscrete acts constituting discrimination or retaliation claims . . . are different in kind from a hostile work environment claim that must be based on severe and pervasive discriminatory intimidation or insult"); *see also Wada v. Tomlinson*, 2007 WL 1378516, at * 58 (D.D.C. May 9, 2007); *Silver v. Leavitt*, 2006 WL 626928, at *12 (D.D.C. Mar. 13, 2006).

Turning to particulars, the written personnel measures contain no intimidation, ridicule or insult.  *See, e.g.*, Pl.'s First Opp'n, Ex. JJ-a; Def.'s First Mot. for Summ. J., Ex. 4 (urging that the plaintiff "understand that the reason for [sick leave] restrictions is not punitive").  No allegation

has been made that they were distributed publicly to humiliate the plaintiff.  Barring Loman's participation in the drafting of the ruling on the suspension proposal, an impropriety the BIA ultimately corrected, the decisions were drafted, issued and processed with all the benign inoffensiveness attendant to bureaucratic proceduralism – laying forth the specific reasons for censure, the factors considered in determining the sanction and the defendant's grievance rights. *See, e.g.*, Def.'s First Mot. for Summ. J., Ex. 4 (explaining decision for issuing sick leave notice). Loman did not issue the measures at an excessive frequency, given the timing of the infractions they allege.  *See Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 117 (2002) (defining a hostile work environment as ubiquitous intimidation, insult and ridicule pervading the plaintiff's day-to-day working life).  Their severity is mild, both collectively and individually: the plaintiff can point to no identifiable workplace consequence attributable to them.

Even the heated shouting by Loman at the plaintiff does not establish a hostile work environment.  The incidents occurred only four times in a nine-month period in 2003.  *See Sprague v. Thorn Americas, Inc.*, 129 F.3d 1355, 1366 (10th Cir. 1997) (holding that five mild incidents of harassment over sixteen-month period did not create hostile working environment). The plaintiff never alleges that Loman physically threatened the plaintiff, even impliedly.  *Cf. Tomka v. Seiler Corp.*, 66 F.3d 1295, 1305 (2d Cir. 1995) (concluding that sexual assault was sufficiently severe to create a hostile work environment).  The plaintiff never alleges, in the time period at issue, that Loman publicly humiliated him: in fact, on three of the four occasions, Loman took the plaintiff aside to a private office, avoiding a public scene.  Am. Compl. ¶¶ 134, 142, 149.  Even crediting the plaintiff's account of the encounter in October 2003 when Loman threatened to have him arrested, removed from the building in handcuffs and jailed, the court

31

cannot conclude that mere bluster of this sort where no concrete charges were made or investigatory actions pursued produces a hostile work environment.  *Cf. Rattigan v. Gonzales*, 2007 WL 1577855, at *17 (D.D.C. May 31, 2007) (concluding that a supervisor's threat – "If I catch you doing something . . . I promise you I'll cut your balls off"– did not cultivate a hostile work environment).  Although the plaintiff does emphasize the disparity in health and combat training between Loman and himself, it would be both unreasonable and unfair to hold every employer to a shifting accountability standard based on the parties' respective health and military backgrounds.  *See Harris*, 510 U.S. at 21-22 (applying objective test instead of relying on evidence of subjective psychological injury).  Even though Loman's actions may have been offensive, ill-considered and rude, the plaintiff has failed to show, or even satisfactorily allege, that they unreasonably interfered with his work performance.  *See Holbrook v. Reno*, 196 F.3d 255, 262-63 (D.C. Cir. 1999) (affirming summary judgment because the plaintiff failed to offer a fact-specific showing of how alleged hostile acts changed the way the plaintiff felt about her job, how the plaintiff performed her job or how colleagues treated her).  The plaintiff's hostile-work-environment retaliation claim, therefore, does not survive summary judgment.

## IV.  CONCLUSION

For the foregoing reasons, the court grants the defendant's motion for summary judgment. An order consistent with this Memorandum Opinion is separately and contemporaneously issued this 25th day of September, 2007

> RICARDO M. URBINA
> United States District Judge